```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA,

 5                 Plaintiff,

 6   -v-                                    Case No. 17-cr-20183

 7

 8   DARRICK DERNARD BELL,

 9                 Defendant.
     _____/

10

11               SENTENCING HEARING, VOLUME 1

12          BEFORE THE HONORABLE MARK A. GOLDSMITH

13        Detroit, Michigan, Monday, April 1st, 2024.

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:       MATTHEW A. ROTH
                              LISANDRA DEL CARMEN FERNANDEZ-SILBER
17                            BLAKE HATLEM
                              U.S. DEPARTMENT OF JUSTICE
18                            211 West Fort Street
                              Suite 2001
19                            Detroit, MI 48226

20
     FOR DARRICK BELL:        JAMES W. AMBERG
21                            Amberg and Amberg
                              32121 Woodward Avenue, Ste. PH
22                            Suite 305
                              Royal Oak, MI  48073

23

24   David B. Yarbrough, CSR, FCRR
     Official Court Reporter
25   (313) 234-2619
```

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE

EXHIBITS

(Identified)        (Admitted)

NONE

1          Detroit, Michigan.

2          Monday, April 1st, 2024.

3          At or about 2:56 p.m.

4                    --     ---     --

5          THE CLERK OF THE COURT:  Please rise.  The United

6    States District Court for the Eastern District of Michigan is

7    now in session, the Honorable Mark Goldsmith presiding.  You

8    may be seated.

9          The Court calls case number 17-20183, the United

10   States of America versus Darrick Bell.  Counsel, please place

11   your appearance on the record.

12         MR. ROTH:  Good afternoon, your Honor.  Matthew Roth,

13   Lisandra Fernandez-Silber and Blake Hatlem on behalf of the

14   United States.

15         MR. AMBERG:  And good afternoon, your Honor.  It's

16   great to see you.  Jim Amberg on behalf of Mr. Bell.  He's

17   sitting to my left.

18         THE COURT:  All right.  Good afternoon.  All right,

19   this is the date and time set for the sentencing.  Are the

20   parties ready to proceed?

21         MR. ROTH:  Yes, your Honor.

22         MR. AMBERG:  Yes, Judge.

23         THE COURT:  Have the attorneys gone over the

24   presentence investigation report?

25         MR. ROTH:  Yes, your Honor.

1           MR. AMBERG:  Yes, your Honor.  I've had a chance to

2    go over it with my client.  We've had a number of objections

3    that we made to probation.  You can see that sort of boiling

4    into why we're here today or part of it, but I have had a

5    chance to review it with my client.

6           THE COURT:  All right.  I know there are objections

7    and I want to go over them with you.  The first question I had

8    had to do with the criminal history.  There's a contention by

9    the defense that certain convictions don't satisfy the 15-year

10   requirement and in looking at the presentence investigation

11   report, there's no government specific explanation about how

12   the 15-year requirement is satisfied.  It relies on the

13   probation department's response which talks in general terms

14   that quote "due to the defendant's continuous parole

15   violations, absconding and escape, he did not complete any of

16   the sentences being objected to until he entered the 15-year

17   period prior to the instant offense."  Now the government's

18   sentencing memorandum doesn't go into any greater detail about

19   that, so I'm trying to understand how the 15-year requirement

20   actually has been satisfied in the government's view.

21           I did have a conversation with probation ahead of

22   time to try to understand better what information probation has

23   and I did receive a sheet of information that appears to be

24   something from the Michigan Department of Corrections.  Just

25   one moment.

1          (Pause)

2          THE COURT:  All right.  Were' back on the record.

3     Mr. Roth?

4          MR. ROTH:  Your Honor, would you want me to stay at

5     counsel table?

6          THE COURT:  You can speak anywhere where there's a

7     microphone.  You can remain seated there or you can come to the

8     podium.  It's your choice.

9          MR. ROTH:  Okay.  Thank you, Judge.  Your Honor, I've

10    had an opportunity to talk to probation as well about this

11    issue and the records that they have from the Michigan

12    Department of Corrections indicate that the defendant was on

13    parole through the period to which he's released in 2013; shows

14    that he was incarcerated up to that time as well.  I don't

15    think that we're going to get exceptionally detailed records in

16    talking with the probation department, but the records are

17    consistent with respect to those underlying charges that the

18    defendant is claiming should not be counted.  The defendant's

19    argument is that if you add up all the days, it exceeds the

20    statutory maximum of the offense, but I don't know that the

21    methodology to which the defense used to come up with that

22    calculation is how Michigan Department of Corrections views it

23    and I think we have to defer to the Department of Corrections'

24    records which indicate that he was incarcerated up until 2013

25    and that he was, still had those offenses, were active in their

1   system until they were discharged upon his release.  So those

2   records tell us that he was still under the sentencing of

3   those.  It could be that the Department of Corrections did some

4   consecutive sentencing given the fact that he had pending

5   matters and picked up a new case.  It could be that they

6   stacked it.  The records don't give us that specificity, but it

7   does show he was still under sentence on those offenses as I

8   understand them up and through 2013.

9           THE COURT:  Well, Mr. Amberg?

10          MR. AMBERG:  Yes, your Honor.

11          THE COURT:  Go ahead.

12          MR. AMBERG:  And I did a very detailed calculation in

13  my sentencing memorandum that reflects what I think is

14  happening here which is that the crimes that are listed as,

15  umm, you know, all these various crimes that Mr. Bell has in

16  his past, the maximum amounts of time you can get for each

17  crime was done while he was in prison, but I think what's going

18  on is this, is that he gets the second degree murder conviction

19  back in the '90s and so he gets a much bigger sentence for that

20  case and now he's in prison on that and all these other cases

21  just sort of get latched onto the big case and I don't know why

22  MDOC wouldn't just say he's finished the sentences on all the

23  other cases because he certainly did.  It would be impossible

24  to put him on parole; he did his maximum amount of time on each

25  one of those sentences.  There's no evidence that this was

1    consecutive and I think that, umm, it would be my experience

2    having done a lot of cases in the state sentence that I would

3    be shocked if it was consecutive.

4        THE COURT:  Well, wasn't he on parole at the time of

5    the 1996 conviction for the second degree murder?

6        MR. AMBERG:  I believe so.

7        THE COURT:  All right.  Well, would that not have

8    suspended the running of the parole sentence at that time?

9        MR. AMBERG:  I think he would have completed it.

10       THE COURT:  Why would he have completed it?  Why

11   would a conviction mean you've completed your parole sentence?

12       MR. AMBERG:  Well, no, no, when he's back in custody,

13   when he's back in MDOC.

14       THE COURT:  That's if it's going to continue to run

15   and be concurrent, but if it's suspended, then wouldn't that

16   explain perhaps -- well, I don't know.  The record I have shows

17   that it was done in 2003, that the sentence for one of these

18   underlying offenses, prior offenses was done in 2003 or '2?

19   Maybe probation could explain.  What is the significance -- do

20   the attorneys have this document from MDOC?

21       MR. AMBERG:  I don't, your Honor.

22       THE COURT:  All right.

23       PROBATION OFFICER LUKE:  Your Honor, if I may, so the

24   document that I provided the Court prior to the sentence is a

25   printout from Mr. Bell's MDOC record.  That was provided by the

1   MDOC to the probation department.  Two of the offenses are

2   highlighted on that sheet of paper including the offenses

3   listed in paragraphs 40 and 41 of the presentence report and

4   highlighted for your Honor are the new maximum dates of custody

5   based on his parole violations and the sentences imposed on

6   those parole violations.  So that paper shows that at this time

7   on, umm, when he was returned as a parole violator with new

8   sentence which appears for the second degree murder charge, he

9   had parole violations and was given sentences of, umm, that

10  moved his release date out to 2000, the earliest 2002 and the

11  latest, 2003.  Additionally, records obtained by the probation

12  department in his criminal history record check show that none

13  of these cases that the defense counsel is referencing were

14  closed out until 2015 so those sentences were still open upon

15  his release from custody for the second degree murder charge.

16          THE COURT:  Well, first of all do you have anymore

17  copies of this?

18          PROBATION OFFICER LUKE:  I do, your Honor.

19          THE COURT:  All right.  Let's give one to Mr. Amberg

20  and to the government as well.  So are you saying that this

21  sheet of paper reflects the convictions from paragraphs 40 and

22  41?

23          PROBATION OFFICER LUKE:  Yes, your Honor.  The packet

24  of information provided by the MDOC, umm, it didn't appear to

25  have a similar piece of paper for paragraph 39, however it

1    would be the view of the probation department that the same,

2    umm, policy or procedure would have been enacted for the

3    offense in paragraph 39 based on the time frame in which he was

4    returned to custody and that offense was also dealt with by the

5    MDOC after he had escaped from the MDOC work camp or prison

6    camp.

7          THE COURT:  All right.  So something on this piece of

8    paper says that the sentences for these two other convictions

9    ended in either 2002 or 2003?

10         PROBATION OFFICER LUKE:  Those were the new maximum

11   custodial dates based on the parole violations.

12         THE COURT:  All right, where on the document should I

13   look to see that?

14         PROBATION OFFICER LUKE:  I think I highlight them,

15   highlighted those --

16         THE COURT:  Is it the one at the bottom or the one in

17   the middle?

18         PROBATION OFFICER LUKE:  The one at the bottom, your

19   Honor, is for paragraph 40 of the presentence report and then

20   in the chart is for paragraph 41.

21         THE COURT:  All right.  So what would explain the

22   sentences maxing out in 2002 and 2003?  Would that mean that

23   the parole sentences continued to run notwithstanding the 1996

24   conviction?

25         PROBATION OFFICER LUKE:  I think that it would be my

1    opinion and, umm, that during the time that the defendant

2    absconded from parole and escaped from the MDOC camp, his time

3    no longer was being credited towards his sentence, so during

4    that time he wasn't serving his custodial time any longer.

5    When he returned on the new, umm, the new charge he was also

6    given additional time for violating and absconding from parole

7    which is reflected on that sheet as well your Honor at least

8    for paragraph 40 which is at the bottom of the page.

9            There should be three separate parole violation

10   sentences that were imposed on each count one, two and three of

11   the conviction at that time.  So I believe that that time was

12   added on to and served from the time he was incarcerated and

13   then those new dates were made based on that additional ordered

14   time.

15           THE COURT:  All right.  So the sentences stopped

16   running during the time that he escaped until he was

17   apprehended.  Is that right?

18           PROBATION OFFICER LUKE:  That would be my

19   understanding.

20           THE COURT:  And how long a time period was that?

21           PROBATION OFFICER LUKE:  It appears to be about six

22   months, your Honor, little over six months, but he also did

23   abscond earlier and during his parole from '92 for almost,

24   almost a year, so around 11 months.  So during that time, he

25   also, the clock kind of stopped on his sentence.

1          THE COURT:  So it stopped for 11 months initially,

2     stopped for six months the second time?

3          PROBATION OFFICER LUKE:  That would be my

4     understanding.

5          THE COURT:  All right.  So 17 months.  Okay.  In any

6     case these sentences are according to this for paragraph 40,

7     for the paragraph 40 conviction, it would have ended in 2003,

8     is what you're saying or 2002 for one of the counts?

9          PROBATION OFFICER LUKE:  I believe because the

10     sentence imposed on the probation violation is a range, I

11     believe that the first 2002 date would be the minimum of that

12     proposed sentence and then the maximum would be the 2003 date.

13          THE COURT:  Now what about the sentences for the

14     other convictions?  Do you have any paperwork at all on that?

15          PROBATION OFFICER LUKE:  I don't, your Honor.  Umm,

16     it, it -- I could not find it in the packet that was provided

17     by the MDOC.  I know for the paragraph 39 conviction,

18     substantially older so I don't know if that had anything to do

19     with it, but it did not appear that that same information was

20     included in the packet provided.

21          THE COURT:  So you have nothing for 38 as well?

22          PROBATION OFFICER LUKE:  No, your Honor.

23          THE COURT:  All right.  So is it possible MDOC has

24     records, they just for some reason didn't include them in the

25     packet they sent to you?

1          PROBATION OFFICER LUKE:  I'm not sure, your Honor.  I

2     would have to double check with them.  The packet provided was

3     pretty large so I'm guessing that they provided all that they

4     had in regards to Mr. Bell, but I can't be for certain if that

5     document exists.

6          THE COURT:  All right.  Mr. Amberg, do you want to

7     respond to any of that?

8          MR. AMBERG:  Your Honor, I find it -- you know, when

9     I wrote the memorandum, I very specifically showed when he was

10    in and when he was out and I just find it hard to believe that

11    there is some sort of mechanism that allows for somebody to

12    serve past their maximum amount of time and --

13         THE COURT:  Well, wouldn't that mechanism be

14    escaping?  You wouldn't be getting credit for when you have

15    absconded, right?

16         MR. AMBERG:  Oh, I agree, your Honor.  That's why

17    when you look at my memorandum, I take those times out.  I only

18    included the times that he actually was in custody, so when you

19    look at that, all of these cases are complete -- the maximums

20    are completed long before the 15 years and however MDOC did it,

21    I mean, I can see something falling through the cracks because

22    Mr. Bell has a separate second degree murder conviction that is

23    a much more significant case that's carrying over into the new

24    millennia, so maybe that was a typo, I don't know, but it

25    doesn't make sense to me that you could serve more than your

1   maximum amount of time in prison.  I mean, it doesn't look like

2   he gives a habitual offender on here, I don't see anything like

3   that.  I mean, he did his maximum time in each one of those

4   cases long before he was ever paroled.

5           THE COURT:  Do you have both periods of escape here

6   accounted for?

7           MR. AMBERG:  I have, umm, let's see, 1990 to, umm, he

8   served time 7-18-1990 to 1-29-1992.  Then he's out.  Then he's

9   back in 10-6-93 to 5-16-1994 and then finally 11-29-1994 is

10  when he then goes in and that's, he's in until he's done

11  serving the incarceration portion of his second degree murder

12  case.

13          THE COURT:  So you have one escape period accounted

14  for, right?

15          MR. AMBERG:  I believe so.  I thought I had two.  I

16  had the 7-18-1990 to 1992 he does 560 days.  Then he's either

17  released or escapes.  Then from October 6th of '93 to 1994,

18  he's in.  Then he's released again, whether that's escape or

19  whatever it is, he's not serving time and then from 5-16 of

20  1994 to 11-29-1994, those days don't count, but then after

21  11-29-1994, that's when he starts again so I've got both those

22  times there reflective in my memorandum that he's out.  So even

23  with both, you take away those days, the 15 year for all these

24  cases is well served before the 15-year period and I mean, I

25  don't know what nuances MDOC may have, but I think if I were to

1    challenge that and say hey look, you can't give somebody parole

2    who's done their maximum sentence, I don't think I could find a

3    judge out there that wouldn't agree with me on that.  Unless

4    there was some sort of different case that he had that stopped

5    all of that and I don't -- I'm not aware of anything in the

6    state system that would do that.  It looks like they just

7    brought him back in and he finished his sentence on all these

8    and then he just did more time on his second degree murder

9    sentence.

10           THE COURT:  All right.  Mr. Roth?

11           MR. ROTH:  Your Honor, Mr. Amberg's argument is

12    premised on the fact that counting actual days of incarceration

13    is the way that you determine whether or not these sentences

14    have been, that the time was allocated to those sentences.  As

15    a punishment for absconding not only once and then escaping,

16    but twice really, they may have decided not to give him credit

17    toward all the sentences that he was, that he had going against

18    him.

19         The record shows us that they have, whatever

20    decision-making process that they engaged in, he was carried

21    over pass 2000 which is really what we're looking at because

22    we're going 15 years back from when the Victory Inn started.

23    So Mr. Amberg doesn't have -- he's simply counting the days he

24    was in and that's assuming MDOC allocated those days to all of

25    these prior convictions.

1          When he picked up the second degree murder after

2     escaping once and absconding another time, they may have

3     stripped him of some of the good time.  They may have decided

4     that he was going to serve on the murder case for a certain

5     amount of time before getting credit on the other offenses.

6     We're, we're kind of arguing against Mr. Amberg's argument

7     without any supporting documentation when we have a

8     documentation from the Department of Corrections that shows us

9     that it goes past that 2000 threshold.

10          MR. AMBERG:  If I could just briefly respond to that,

11     your Honor, because I know we're all, Mr. Roth, myself, your

12     Honor as well, we're all experienced in the state's criminal

13     system.  I am under -- I have no knowledge of any mechanism in

14     which the MDOC could add time.  I think that's sort of stepping

15     into the province of the judge because the courts would, like

16     the sentencing judge in each one of these cases has a decision

17     to make that sometimes they could run it consecutively,

18     sometimes they can run it concurrently, but I don't think an

19     escape would then give the MDOC the ability to then change a

20     sentence because that's what it would have to be.

21          MR. ROTH:  Well, I'm not implying that they changed

22     the sentence, I'm implying that where do they allocate the

23     credit for time served?  Are they going to give him credit for

24     time served on all four of these offenses after he absconded,

25     after escaped and then after he picks up a second degree

1    murder?  I think that the MDOC has the discretion and I don't

2    know this, but it makes sense that when somebody has done what

3    he did with four pending cases, that they may say we're going

4    to take away good time, we're going to let you serve some now

5    and then some later or they're going to extend when they're

6    going to grant parole.  It's certainly within their discretion.

7           The sentence issued by the Court was he had to serve

8    at least one year and six months on two of the three and then

9    six months on another.  That's what the Court decides.  Once he

10   serves that time, jurisdiction over the defendant shifts from

11   the Court to the Michigan Department of Corrections and the

12   parole board and depending on how they allocated the time that

13   he served to whatever offense they were allocating it toward

14   could in fact keep him past the statutory maximum if he's not

15   getting that credit until later on and we don't know what they

16   did, but we do what the end result was based on the records.

17          THE COURT:  Well, that's what I'm wondering, do we

18   know the end result.  I'm looking at the presentence

19   investigation report and for each of these convictions it's

20   showing released from parole February 5 of 2015.  I'm not sure

21   where that's coming from, especially in light of this

22   information sheet from MDOC saying the maximum would be reached

23   either in 2003 or 2002.

24          MR. ROTH:  I think --

25          THE COURT:  How do you explain that?

1      MR. ROTH:  I think that he was released from parole

2  on the murder case on 2013 and 2015 and what you're looking at

3  is and probation can correct me if I'm wrong, but it's listed

4  on pretty much all of them.  I think you're just getting a

5  complete synopsis of his history with the Michigan Department

6  of Correction because I believe he was released around 2013

7  before this, before our case started.  So I think you're

8  looking at when he was off on the second degree murder case.

9      According to the records that probation has, it looks

10  as if with respect to the convictions that are in dispute, he

11  was held on those until 2002 and 2003 which means that however

12  they allocated credit, that, those sentences weren't completed

13  until those times and again I'm not suggesting that they have

14  the power or they changed the sentence of the Court that

15  imposed those sentences, I'm suggesting that MDOC imposed some

16  sort of penalty on him for escaping and absconding and getting

17  a second degree murder charge which really makes sense because

18  when you have those violations, is he automatically to come

19  back as if nothing happened?  It's natural and we do that in

20  the federal system that when you engage in, you get violations

21  in the system or you're doing things you're not supposed to do,

22  there's a penalty; they take away good time or put you in

23  solitary.  There's consequences for those actions and it looks

24  like those consequences for him was that the parole was

25  extended past 2000.

1       THE COURT:  What I'm still trying to understand is

2  for the convictions that are set out in paragraphs 38, 39, 40

3  and 41, each one says released from parole, 2-5-2015 which

4  doesn't seem to square with what's on the sheet that says the

5  maximum for at least 40 and 41 would have been reached in 2003

6  or 2002.  Do you want to explain that?

7       PROBATION OFFICER LUKE:  Your Honor, if I may, I

8  believe because he, umm, Mr. Bell had the sentence for the

9  second degree murder, all, this all kind of ran together and he

10  remained in custody and that sentence, custodial part of his

11  sentence for those older offenses may have completed in 2003 or

12  2002, however he still, they could have put him back on parole

13  for all these offenses at the same time when he finished his

14  second degree murder charge.  As I stated, his criminal history

15  printout on ATLAS indicates that none of the older cases were

16  officially closed until the completion of his parole in 2015

17  and those were closed by legal order and it would be my

18  understanding is is that he was then released on parole for all

19  those charges because he couldn't be released from parole when

20  he finished in 2003 because he was still serving the second

21  degree murder sentence.

22       THE COURT:  All right.  Well, thank you.  It seems to

23  me we're making some assumptions here about what MDOC did or

24  could have done and I'm thinking maybe we need to go back to

25  MDOC and get something definitive about when did parole end for

```
 1    Mr. Bell for all of these convictions because it sounds like
 2    we're making some assumptions that they were impacted by the
 3    murder conviction and then we're not really sure did they end
 4    his parole at that point?  Did they suspend it?  Did it
 5    continue to run?  Let me know why you think that is a good idea
 6    or bad idea.
 7              PROBATION OFFICER LUKE:  So it would be the position
 8    of the probation department that his, his parole stopped when
 9    he returned to custody for the second degree murder charge.  He
10    was given parole violations as evidenced by the sheet of paper
11    I provided the Court and the parties earlier and that on his
12    movement sheet in, so the sheet provided by the Michigan
13    Department of Corrections that shows when he returns to
14    custody, when he absconded, when he escaped, when he returned
15    to custody finally for the second degree murder offense and
16    when he was ultimately paroled again for the final time in
17    2013, he was discharged from parole in 2015.  There's no
18    indication in any records that the older cases were closed, his
19    parole was completed or anything like that prior to 2015.  In
20    2015 he was discharged from parole and it -- that is when all
21    of his cases based on the records probation have were closed by
22    the state of Michigan.
23              THE COURT:  Now you don't have any paperwork at all
24    though on the convictions reflected in paragraphs 38 and 39,
25    right?
```

1              PROBATION OFFICER LUKE:  I don't, your Honor.

2              THE COURT:  All right, so how can we make any

3       decisions regarding those convictions?

4              MR. ROTH:  Your Honor, if I may?  If the Court was to

5       grant the defendant's objection and strike those prior

6       convictions and find that they don't count, his guideline range

7       depending on how the Court rules on the offense variables could

8       remain the same even without those convictions.  It would drop

9       him down to a category three and at the offense variable

10      decided by the probation which is 40, he would still have 360

11      to life guidelines so what I would suggest to the Court is if

12      we could put this on the back-burner for now and go through the

13      remainder of the objections, that it may end up being a moot

14      point meaning that we may just agree not to score the

15      convictions being challenged by the defense because it will not

16      make a difference at his ultimate guideline range depending on

17      how the Court rules on the offense variables and I would tell

18      the Court in complete candor that if that is the case, I will

19      stipulate that for the purposes of this hearing that we won't

20      score that because it will not make a difference and it would

21      allow us to proceed at this time.

22             THE COURT:  Mr. Amberg?

23             MR. AMBERG:  Well, the only thing I would say in

24      response is that through the BOP, that they do look at your

25      criminal history when they're doing things.  My understanding

```
1    is like for example the difference would be between a category
2    three versus a category six.  Now I understand there's career
3    offender, but I think that might be important to BOP
4    calculations for what programs Mr. Bell is eligible for, where
5    he stays during his time of incarceration so it would have to
6    have a ruling on that no matter what and, umm, so if the
7    government's conceding that these priors can't be used 'cause
8    they're outside of the 15 years, then great, then that'd be
9    perfect and now we can move on to the rest of the stuff, but I
10   think the Court has to make a finding on that.  Otherwise,
11   we're going to -- Mr. Bell will be in limbo there at the BOP.
12             THE COURT:  Mr. Roth?
13             MR. ROTH:  Your Honor, I would reiterate what I said
14   which is if we end up at the same guideline range that we're at
15   with the convictions without them based on the rulings of the
16   Court, I think there's a good possibility that we would just
17   agree not to count those so that we can complete sentencing
18   today.
19             THE COURT:  Well, Mr. Amberg, maybe I'm not following
20   exactly what you're saying.  If Mr. Roth is right and it
21   doesn't change the guidelines assuming I rule the way the
22   government's asking me to rule with regarding to the offense
23   variables, what purpose is served by determining the criminal
24   history category?  You're saying that in and of itself will
25   determine certain things like what programs he's eligible for?
```

1        MR. AMBERG:  I -- my experience has been that the BOP

2   does look at that.  I'm not sure, I'm not expert on it, but I

3   do know that that may come into the calculation about

4   everything from programs to where he would go and also I would

5   say it would also go into my argument for, umm, you know, what

6   he should actually be looking at guideline-wise and as a

7   mitigation on a sentence because --

8        THE COURT:  Well, if we don't score these

9   convictions, then he'd be in a different criminal category,

10  right?

11       MR. ROTH:  I believe he has 16 criminal history

12  points and striking those convictions would be 12 less which

13  would give him four criminal history points which would put him

14  at a category three.  If the offense level is as probation

15  calculated it at 40, category -- offense level 40, category

16  three would still have the same guideline range.

17       THE COURT:  So wouldn't he be eligible for the

18  programs of someone who's in a category three then?  I'm not

19  following how he is in any way prejudiced then.

20       MR. AMBERG:  Well, if, I guess if the government's

21  okay with it.  You know, if everybody agrees that this

22  shouldn't be scored, then I think that's what we're looking

23  for.

24       THE COURT:  Well, that's what I understood the

25  government to be saying that after the offense level

1   calculations are completed, if I'm in agreement with what the

2   government's asking me to do, then they don't have any

3   objection then to not scoring these convictions and dropping

4   him then into a category three.  Is that right?  I'm hearing

5   that right?

6           MR. ROTH:  You're hearing it correct your Honor and

7   I'm not asking for the Court to impose sentence before that

8   decision is made.  I'm just saying if we reach the same

9   guideline and it's, in my opinion it's moot and in fact it's to

10  the advantage of Mr. Bell because if I dismiss -- if I agree

11  that those don't count, it does drop his criminal history

12  category which could only improve his position in a facility

13  that has the programming he wants.  So I think that, you know,

14  we have a substantial interest in where the sentencing falls

15  and I'm offering to temporarily table the discussion about the

16  criminal history categories, we may still get there, in which

17  case I don't think it's worth the time and energy of the Court

18  to have to deal with the older 1989 and 1990 convictions.

19          THE COURT:  All right.  Let me look at one of the

20  issues that impact the offense level and I want to make sure I

21  understand the respective positions and this has to do with the

22  drug quantities and specifically the government's position that

23  the base offense level should be 30.  The defense is saying it

24  should be 24, umm, I think it's saying 24.  The presentence

25  investigation report says the base offense level is 30 although

1   the quantities that are set out in paragraph 27 for the base

2   offense level don't quite match the quantities that are set out

3   on page 26 of the government's memorandum so I want some

4   clarity whether the base offense level in the government's view

5   of 30 represents eliminating the sentence disparity for

6   powdered or crack or is something else at work here because

7   again the quantities don't seem to match up.

8          MR. ROTH:  Your Honor, with respect to the

9   quantities, it's the position of the Department of Justice to

10  advise the Court as to its position as to powder to crack

11  disparity.  The Court has absolute discretion as to whether or

12  not it wants to consider the disparity or if the Court wants to

13  go forward and sentence the defendant based on the crack

14  cocaine.

15          We presented our calculations as to the quantities

16  that we believe the defendant distributed as part of the, was

17  his role in the conspiracy and we think it's at 34 and our

18  calculation is different than the probation department 'cause

19  the probation department just considered the statutory minimums

20  that trigger the 10-year mandatory minimum, but we know based

21  on the testimony at trial that there was much more than just

22  that.  So because that's what the conviction was for on the,

23  umm, that the jury looked at, that is why they're at those

24  levels.  280 is the mandatory minimum to trigger the 10 year

25  for crack cocaine and 100 for heroin, but we believe that the

1    evidence shows that there was a lot more and that is the

2    differential between what we have represented in our sentencing

3    memorandum and what probation has on the presentence

4    investigation report.

5           THE COURT:  So your statement at the bottom of page

6    26 when you say the converted drug weight puts Bell at an

7    offense level of 30, is that after eliminating the powder to

8    crack sentencing disparity?

9           MR. ROTH:  Yes.  It was simply done so that the Court

10   could see the difference between if it did or did not sentence

11   under the cocaine crack disparity.

12          THE COURT:  All right.

13          MR. ROTH:  So if the Court was to sentence crack as

14   crack in the guidelines, it would be level 34.  If the Court

15   was to use the conversion ratio for powder cocaine, it would be

16   30 so we are at the same level as probation with the

17   conversion, but higher without based on the testimony at trial

18   and the evidence in the case.

19          THE COURT:  Okay.  So Mr. Amberg, do you agree that

20   if we eliminate the powder to crack disparity, then Mr. Bell's

21   offense level is 30?

22          MR. AMBERG:  No, your Honor.  I agree with probation,

23   we start at 30.  Once you do the disparity and equal the crack

24   to powder cocaine, it would be a level 24.  The government,

25   what they're saying is hey, we don't agree with probation, we

1    think that the underlying quantity is higher and of course I

2    disagree with that.  The jury found what they found and those

3    were the numbers that were put in front of them.  A lot of what

4    the government relies on is speculative through witnesses who

5    in my opinion were not believable and, you know, I think the

6    probation department got it right, it starts at a level 30 and

7    if you look in my brief, I convert that crack drug weight

8    'cause it starts out at 280 grams of crack and that would be

9    999 kilograms of converted drug weight, but if it's just

10   regular cocaine then the converted drug weight is 56 kilograms

11   so you can see that major disparity there between the two and

12   that's how I got to 24 is applying what the Department of

13   Justice wants us to do or at least as I've attached Merrick

14   Garland's advocation for doing that.  So I disagree with the

15   amount of narcotics that the, the quantity the government has

16   put forward.  I agree with probation and it should be a level

17   24, your Honor.

18          THE COURT:  Well, what's the authority for using the

19   statutory numbers versus using what the jury found?  Where do I

20   look to find which one I'm supposed to follow?

21          MR. AMBERG:  Well, I think in this situation it's the

22   same thing.  That level 30 that is in the presentence report,

23   that is reflecting what the jury found.  So, I mean, the jury

24   was as Mr. Roth said, they were deciding a drug quantity amount

25   which was important for purposes of mandatory minimums, but

1    that was what the jury found and so this is not a clearcut case

2    by any means so when we are saying to ourselves we should or

3    the government is advocating to go higher than that what the

4    jury found, I would argue that as I've argued with other parts

5    of my memorandum, it's, umm, you know, we're taking things away

6    from the province of the jury although I understand that

7    there's no statute or case that stands for that proposition.

8    When you look at like Judge Sotomayor's, part of her opinion in

9    that McClinton case, you kind of see the reality of the

10   situation.  When the government comes in and advocates for

11   things far higher than what the jury is deciding, it sort of

12   makes you wonder why did we have a trial in the first place.

13          So to answer your question, your Honor, I don't think

14   there's any statute that says you have to follow what probation

15   decides or that what the jury decides, but I think that if you

16   asked the average person on the street what would be fair,

17   that's what would be fair.  The jury didn't decide it was this

18   much more significant number that the government wants the

19   Court to apply.  I was in this trial.  Your Honor was here.

20   Those witnesses were not believable.  Ms. Gaggo was not

21   believable.  There was an acquittal in this case for the main

22   witness that started this case.  I think that the idea to just

23   simply say hey, all these people were credible and we're going

24   to elevate this drug quantity I think does a disservice to the

25   jury in this case and because of that, I would ask that your

1    Honor follow what probation recommended except take away the

2    crack to cocaine disparity and find a level 24.

3          MR. ROTH:  Your Honor, defense counsel is just wrong.

4    There's no other way to say it.  The case law says that the

5    Court must prove the weight -- the government must prove the

6    weight of any drugs by a preponderance of the evidence and that

7    the Court must choose an estimate of that drug that protects

8    the defendant from a drug quantity higher than what they're

9    actually responsible for.  The burden is on us to show by a

10   preponderance of the evidence that the weight we think should

11   be taken into consideration is the correct weight.

12          When defense counsel says the jury has spoken, the

13   jury was never asked how much quantity of drugs did Darrick

14   Bell or is Darrick Bell responsible for.  The jury was asked

15   according to the case law whether or not he distributed at

16   least the threshold for them to trigger the mandatory minimum.

17   That's what they are required to decide by law, that's what the

18   case law says, they have to decide what that, that threshold

19   was met, but the Court can take into consideration the totality

20   of the evidence from the testimony that was provided and make a

21   determination of whether that amount of distribution was

22   actually higher and that's what the Court's duty is and that's

23   what the case law says.

24          This is not about taking this out of the hands of the

25   jury nor is it about going up and down Fort Street asking a

1   regular person if they think it's fair and to talk about

2   Sotomayor is conflating one argument he has about using

3   acquitted conduct with what we're actually talking about here

4   which is determining the drug quantity.  That's what the Court

5   needs to do.  When the Court determines the drug quantity, the

6   Court has to make sure that the amount it determines is not

7   more than what the defendant actually distributed.  How does

8   the Court do that?  The Court's to engage in a conservative

9   estimate of how much he distributed which is exactly what we

10  did in our sentencing memorandum.

11          We took the most conservative approach we could take.

12  We used testimony from trial and it's completely irrelevant

13  whether Mr. Amberg believed Brian Dougherty, Janet Gaggo, Sarah

14  Fernandez, Amanda Pauley, Rachel Ayers, it doesn't matter what

15  Mr. Amberg thinks of their testimony.  This Court heard the

16  testimony collectively of everyone and what we heard was that

17  all the drugs flowing through the Victory Inn or the vast

18  Majority of them came from Darrick Bell.  So we took the

19  testimony from trial, we took the Rule 11 Plea Agreements where

20  people made admissions about what they distributed and we cut

21  it all down to make a very, very conservative estimate about

22  how much Darrick Bell's conspiracy and Darrick Bell himself is

23  responsible for and that's where that number goes in.  That's

24  where that number comes from to put us at a base offense level

25  of 34 and we outlined those calculations in our sentencing

1    memorandum.

2         Defense counsel's argument about whether it's fair is

3    just way off base.  This Court has the power and the duty to

4    determine what the base offense level is based on the drug

5    quantity and the Court can decide Brian Dougherty was not

6    credible, that's the Court's call, not defense counsel, but the

7    Court's call, but I think when you look at the totality of the

8    evidence and our suggestions at how to -- our arguments as to

9    how we show what we show, I think we are soundly at a base

10   offense level of 34.

11        THE COURT:  All right.  I need to look at something.

12   Hold on.

13        (Pause)

14        THE COURT:  All right.  So the government's position

15   is that paragraph 27 in the presentence investigation report

16   properly sets forth 30 as the base offense level after taking

17   into account elimination of the disparity, but that's because

18   the government is saying there's evidence at trial for higher

19   drug weights.  Is that right?

20        MR. ROTH:  Yes, your Honor.

21        THE COURT:  Drug quantities, and the defense thinks

22   that 30 is properly scored based on the statutory quantities,

23   but that it should be reduced to eliminate disparities and get

24   us down to 24.  Is that right?

25        MR. AMBERG:  Yes and the lack of credibility of the

1    witnesses and evidence at the trial.

2         THE COURT:  All right.  The problem I'm having is

3    this wasn't exactly presented this way between the presentence

4    investigation report and the memoranda.  It, it would appear

5    the only dis -- well, I wasn't even sure there was a

6    disagreement, but it wasn't presented as whether we should use

7    the statutory figures or whether we should use trial testimony

8    and so now I'm struggling to see what am I supposed to do in

9    terms of picking between those two measures?  Where do I look

10   for that, Mr. Roth?

11        MR. ROTH:  Your Honor, we cited cases in our

12   memorandum on page 20 that does address this issue.  There's a

13   new case out that just came out in February of 2024,

14   United States v. Histed, H-i-s-t-e-d, 2024 West Law, 726245

15   that says that the district court relies on -- it talks about

16   the evidence that the district court relies on to support the

17   estimate must have a minimum level of reliability and the Court

18   needs to err on the side of caution in making its estimate and

19   what that Court did was they looked at the evidence that was

20   presented and used the evidence to determine what they thought

21   was a reasonable amount for the drug quantity and if the Court

22   considers it in the context of how the guidelines were written,

23   the guidelines are written for different levels and different

24   quantities.  If the Court's only responsibility was to look at

25   the mandatory minimum, we wouldn't have this sliding scale on

```
1   the drug quantity table of different levels for different
2   amounts.  The jury is only required to come up with the
3   mandatory minimum as defined by statute.  It says not less than
4   280 grams or not less than 100 grams of heroin.
5          What we're asking the Court to do is to look at the
6   evidence that was presented at trial as we wrote in our
7   sentencing memorandum, look at what other defendants admitted
8   to distributing in their Rule 11 agreements and that a Court
9   can use that evidence of what happened at trial and what's
10  happened -- what's listed in the Rule 11s to find by a
11  preponderance of the evidence whether or not it is a fair
12  estimate conservatively by the government as to what the
13  quantity is.  There is no other sources of information the
14  Court can look to.  The Court has to look at what happened at
15  trial and what the witnesses said which is why we extensively
16  quoted the witnesses directly from the transcripts and the Rule
17  11s in our sentencing memorandum.
18          MR. AMBERG:  Your Honor?
19          THE COURT:  Yes.
20          MR. AMBERG:  Here's why you don't see me talking
21  about this in our memorandum, because when the government had
22  the chance to make an objection to that level 30, they didn't
23  do it.  When you actually look at the PSI when you go to page
24  ID 11092, objections by the government, none.  I take that to
25  mean that they agree that the level 30 was it and that's why --
```

1          THE COURT:  Well, they do agree that level 30 is it,

2    but it's getting there in a different route.  It's not

3    objecting to the number, it's saying that is the number, the

4    number is because it starts higher and gets reduced because of

5    elimination of disparity.

6          MR. AMBERG:  Well, I, I mean, I understand --

7          THE COURT:  I'm not necessarily disagreeing with you,

8    but when you look at this, that's one way to look at this as

9    not calling for an objection, but it makes my job a whole lot

10   harder now because I haven't seen this as the dispute between

11   you two.

12         MR. AMBERG:  Right and I would say this, your Honor.

13   I understand, I think it's just by coincidence that it comes

14   back to level 30.  That should have been in here as an

15   objection.  We object to 'cause it's not 30 at the end, the

16   probation department's PSI puts on there their reasoning for

17   why it's a level 30 so how am I supposed to, you know, I have

18   to make objections when I'm supposed to, right, and as you can

19   see I made a bunch of them and that there's no objections by

20   the government for the probation department finding the numbers

21   that I agreed with, not this new, this is something new that we

22   just learned about a week ago.  So I would, I think that the

23   government had their chance to make this objection and they

24   didn't do it and because of that they're stuck with this level

25   30.  I get it that with the crack disparity it brings the

1    guideline level down, but that's not my problem.  They should

2    have made the objection then and we could have had at it, umm,

3    properly like if it was me.

4         THE COURT:  All right.  So Mr. Roth, maybe you can

5    explain why Mr. Amberg is wrong if that's your view.  He's

6    saying you didn't lay out the analysis of disagreeing with the

7    way in which probation got to 30, you apparently agreed with

8    the 30, but not the way probation got to 30.  Is that correct?

9    Is that a proper way to look at what has happened here?

10         MR. ROTH:  Your Honor, if I may just have one moment?

11    I just want to look at one thing real quick.

12         (Pause)

13         MR. ROTH:  Your Honor, I'm going to tell the Court

14    two different things.  One, I have Mr. Amberg's objections in

15    front of me and I don't see him making any reference to asking

16    for it to be 24, so I may be missing it, but I have a copy of

17    it here, so, you know, the same argument can be said to him

18    that if he doesn't object and say it should be a 24, then it

19    should be a 30 like probation says, but I would respond to the

20    Court this way.  The Court has the discretion to determine

21    whether or not it wants to apply disparity.  There is no rule

22    that says it has to do that and although I could have objected

23    specifically and said that I got to that number a different

24    way, I believe that given the department's policy, that 30 is

25    the right answer.  I did get there a different way and in

1    retrospect it would have been prudent to outline the way I got

2    there, but the fact of the matter is the law still has the

3    Court, puts the duty on the Court to determine what the fair

4    quantity is and we're not saying it should be more than 30,

5    we're saying is we think the quantity's a base offense level of

6    34.  With the disparity, it's a 30.  Mr. Amberg could have put

7    on there and if I'm wrong, Mr. Amberg can correct me, he could

8    have put on there we agree that it's a 30, but the disparity it

9    should be 24, but he didn't do that either because we were both

10   looking at 30 as the correct ultimate, I looked at it as the

11   correct conclusion.  He looked at it as a starting point and

12   went down from there.  So I apologize to the Court if I

13   wasn't -- if I should have been more clear, but I think that

14   when I look at it and I don't see him objecting to the 30 and I

15   agree that the 30's right, I think that that's where we end up.

16          MR. AMBERG:  I -- it's comparing apples to oranges,

17   your Honor.  There's a big difference between when you look at

18   the PSI on parenthetical 27 where the probation department is

19   telling us how they got to this number, which I agree with.

20          My arguments for the disparity is a persuasive

21   argument.  That's not by law.  That's not an agreement that I

22   have to put in any way in any objections 'cause it's not an

23   objected -- it's not something you would object to.  On the

24   other hand the government certainly if they objected to that

25   finding, they had to object to it so I had no reason to do that

1    because I don't expect anybody would say hey I object to

2    something because I feel it's persuasive.  All the disparity is

3    and what I've attached to my brief is persuasive.  That's all

4    that that is.  Your Honor doesn't have to follow that.  I mean,

5    that's just what the Department of Justice has put out as

6    persuasive, but the government had that chance to object to the

7    finding on paragraph 27.  It's very specific and tells

8    everybody how the weights were found to be and they didn't do

9    it and because of that, here we are now at the sentencing and

10   there is an objection there, but I didn't respond to that

11   because I agree with the way probation found and there was no

12   objection.  You can see how you object.  Look at how I objected

13   to everything else on here, so.

14          THE COURT:  Mr. Amberg, doesn't paragraph 66 set out

15   the guideline calculation based on a total offense level of 40

16   and a criminal history category of six and there's no objection

17   I don't believe from you to that paragraph, right?

18          MR. AMBERG:  Right 'cause that's the career offender,

19   your Honor.

20          THE COURT:  Huh?

21          MR. AMBERG:  That's the career offender guidelines I

22   believe?  Well, I mean, I objected to the specific things I

23   thought should be changed within the guidelines.  You can see

24   all of my objections at the end, your Honor.

25          THE COURT:  There's no objection regarding the

1    guideline range other than you talk about the career offender

2    not being -- should not be scored because of prior convictions

3    being too old which is what we talked about earlier in this

4    hearing.

5           MR. AMBERG:  I think that just applies to count

6    eight, right?  The maximum of count eight is 20 years, so and I

7    think that's what it says on paragraph 66.

8           THE COURT:  Well, however you slice and dice it, it

9    doesn't sound like this issue has been actually laid out fully

10   in what has been presented and that's my concern.  I don't

11   really have a defense response to the argument of the evidence

12   that's been presented about why calculations of quantities

13   should be higher than what the minimums were that were found by

14   the jury.

15          All right, I want you to hold that thought for just a

16   moment because you've got another problem and that has to do

17   with the acquitted conduct issue.  It seems it me the argument

18   about the trafficking evidence being utilized here doesn't turn

19   necessarily on a count for which Mr. Bell was acquitted.  It

20   was one subsequent trafficking count for which he was

21   acquitted, but the count of conspiracy was a count in which the

22   jury could not agree, so it seems to me the government is

23   actually not trying to use acquitted conduct, the government's

24   trying to use conduct as to which the jury didn't reach a

25   verdict, umm, so that's point one I just wanted to throw out

1    for your consideration.

2            The other point occurs to me is that it would seem to

3    me that the government could point to much of the same

4    testimony, maybe all of the testimony that went to count one as

5    a violation of Michigan state law of someone who arranges for

6    commercial sex activity which would not have raised any of the

7    issues that we know from the jury questions that were submitted

8    to us that may have been, may have been issues for the jury;

9    namely, the issue of coercion and the issue of interstate nexus

10   which I don't believe would be issues that would have impacted

11   a state prosecution.  So my question for your consideration is

12   can I take into account the testimony that made out state

13   crimes without the additional federal issues that may have

14   impacted the jury's decision-making about count one?  I wanted

15   to get your reaction to that.  Mr. Amberg?

16           MR. AMBERG:  Yes, your Honor.  No.  That's my

17   reaction, no.  Very -- I believe very much that in this case,

18   the jury acquitted Mr. Bell of one of these counts and the jury

19   hung on the rest.  The government chose to not proceed.  We

20   want, we want our trial.  We want that.  The jury has or the

21   government has chosen to not proceed further and just stick

22   with the convictions for the drug conspiracy.  I understand why

23   they did that, but for us this has always been about the sex

24   trafficking and he is not a sex trafficker.  That's what it's

25   always been about so this idea that to look at well maybe in

1   the state system this might be, you know, sex trafficking or

2   maybe -- it's so unfair and it's everything that the Court was

3   talking about in the McClinton case and that's why I put it in

4   there and quoted it so much because it's -- if we're going

5   to -- what is the point of having a trial if the government can

6   just say oh it's a hung jury, you know what, we're going to

7   just dismiss everything and guess what, we're going to hold you

8   responsible for it anyways.  I mean, that's what's going on

9   here.  I think it's completely unfair.  It's so unfair.  It

10  just cuts through the reasons why we have jury trials and put

11  things in the province of the jury all together.  So this idea

12  that maybe the state of Michigan stuff can be used?  Well, why?

13  We're here for a drug conspiracy prosecution, not a sex

14  trafficking hung jury and acquittal.  We're here for, like does

15  that have something to do with whether or not Mr. Bell was

16  selling drugs?  I would say no.  I don't even think your Honor

17  should consider it.  I mean, why don't we treat this for what

18  it really is?  This is a small-level drug conspiracy case and

19  we should be looking at it as such and your Honor should be

20  deciding your sentencing based on that.

21          I think it's very clear that the Supreme Court feels

22  like this might be unconstitutional.  I would say it goes

23  beyond acquitted conduct, it all goes within that same umbrella

24  because if you think about it, I mean, hung jury doesn't mean

25  conviction at all, it doesn't.  It means government should if

```
 1    they believe that my client did this, retry him, let's go.
 2    We've been ready.  We've always been ready, you know?
 3    Unfortunately they chose not to do that, so they should have to
 4    suffer the consequences of that.  So to answer your question,
 5    no, no, your Honor.  Thank you.
 6              THE COURT:  Okay.  Mr. Roth?
 7              MR. ROTH:  Your Honor, is the Court talking about
 8    determining the guidelines or is the Court talking about just
 9    allocution or is it talking --
10              THE COURT:  Just allocution, not guidelines.
11              MR. ROTH:  Okay.  So Judge, I looked at the McClinton
12    case that defendant cited and, umm, they punted the issue and I
13    think that there's some movement some time maybe in the future
14    where they're going to tell us not to look at acquitted
15    conduct, but what the Solicitor General said on behalf of the
16    United States in its response was that judges have always had
17    broad discretion to engage in factfinding to determine an
18    appropriate sentence within the statutory range and they've
19    enjoyed historically the discretion to impose a sentence based
20    on additional facts that are found by a preponderance of the
21    evidence.  There's a statute on point that's 18 U.S.C., 3661
22    that says there shall be no limitation placed on the
23    information concerning the background, character and conduct of
24    a person convicted of an offense and considered for the purpose
25    of imposing an appropriate sentence and what the Solicitor
```

1    General says in the McKinney case -- is it McKinney, the

2    Clinton case, sorry, the McClinton case, Judge, is essentially

3    if you're only allowed to argue what the defendant was

4    convicted of, then you're only allowed to argue the things that

5    make up the elements of the offense and that's not how this

6    system of justice has worked since the beginning.

7         The Court is not precluded from sentencing someone

8    using tunnel vision.  All the time we look at facts that are

9    outside of what a defendant pled to or what a defendant was

10   convicted of when we're trying to find the appropriate sentence

11   and what defense counsel wants you to do is completely ignore

12   everything you heard about the sex trafficking victims and he's

13   saying you got to just ignore all of it, it's not fair, but

14   it's not necessarily about whether it's fair or not.  You were

15   present during the trial.  You heard the testimony.  You get to

16   judge the credibility of the witnesses that you heard when

17   you're thinking about what the appropriate sentence should be.

18   That's all that we're talking about.  I'm not asking you to

19   give him a higher guideline range because of anything to do

20   with the sex trafficking.  In fact, all of our responses to his

21   objections are based just on the drug trafficking, but since

22   when is a Court required to put on blinders and say I'm not

23   going to think about the fact that these women were engaged in

24   commercial sex acts and that's what made them so good for his

25   drug trafficking conspiracy?  Since when is this Court going to

| | |
|---|---|
| 1 | have to ignore the violence that we heard that the women |
| 2 | suffered because they were forced to engage in sex trafficking |
| 3 | to buy his drugs?  These cases are, it's like what came first, |
| 4 | the chicken or the egg; which was happening first, the sex |
| 5 | trafficking or the drugs?  We're not going to know, but they're |
| 6 | so intertwined, to ask this Court to put blinders on and ignore |
| 7 | what composes of half of this case is preposterous and that's |
| 8 | what the Supreme Court has said over and over again and that's |
| 9 | what courts around the country have said. |
| 10 | You're not just going to consid -- you're not looking |
| 11 | at acquitted conduct and saying well even though he was found |
| 12 | not guilty, I'm going to think he's guilty.  That's the wrong |
| 13 | lens to look at this.  You're looking at it saying I heard |
| 14 | Amanda Pauly testify about the horrors that the women went |
| 15 | through to buy the drugs from Darrick Bell.  I heard what they |
| 16 | had to go through to buy the drugs from Darrick Bell and that |
| 17 | is why his drug conspiracy which is nothing if not large and |
| 18 | enormous, that's why his drug conspiracy was so evil because he |
| 19 | chose a location where these women existed, where these women |
| 20 | could work the streets to buy his drugs, so to say don't |
| 21 | consider any of that isn't how it works.  You get to consider |
| 22 | what you think is credible evidence that you think existed |
| 23 | based on preponderance of the evidence and that is so that you |
| 24 | can fashion a sentence that you think is just, within the |
| 25 | statutory scheme laid out by Congress. |

1      THE COURT:  I want you to respond to the issue of

2  whether I can take into account that the testimony made out

3  violations of Michigan criminal law.

4      MR. ROTH:  I think you can take up whatever you think

5  is appropriate for your own consideration because I think it's

6  all the same.  If you think that he engaged in other criminal

7  conduct that broke other laws when you're looking at the

8  3553(a) factors, you can consider that.  You can consider

9  things that he did he wasn't charged with when fashioning a

10  sentence 'cause that's what 18 U.S.C., 3661 tells us and that's

11  what the case law up to this point tells us is that you can

12  consider things that he did to determine what is necessary to

13  make sure that the public is safe for him.

14      What is just punishment?  If this Court is looking at

15  a conviction for drug trafficking, in and of itself just

16  punishment may mean one thing to the Court, but if the Court is

17  looking at a case where there's drug dealing and there's a lot

18  of violence, that may be just punishment may mean something

19  else.  No one has ever said and no one will tell a judge you

20  have to look at just what was convicted of.

21      You're the judge.  You get to look at things that you

22  think are relevant to fashioning a sentence whether it's

23  violations of state law, acquitted conduct or hung juries.  You

24  heard the testimony.  You get to make your own credibility

25  determination about whether or not that warrants you to

1    sentence in one direction or another.

2         THE COURT:  Mr. Amberg, anything else?

3         MR. AMBERG:  Yes, your Honor.  I'm going to read

4    Justice Sotomayor quotes because she's a much more brilliant

5    lawyer than I ever could be and I think she really nails it

6    here and why you should not consider this stuff and this is on

7    page three of my brief.  An acquittal may quote "reflect the

8    jury's conclusion that the state's witnesses were lying and

9    that the defendant is innocent of the alleged crime," unquote.

10   A, quote, "jury trial is no mere procedural formality, but a

11   fundamental reservation of power in our constitutional

12   structure," unquote.  Quote, "concerns about procedural

13   fairness and accuracy when the state gets a second bite at the

14   apple with evidence that did not convince the jury coupled with

15   a lower standard of proof" unquote and that, quote, "acquitted

16   conduct sentencing also raises questions about the public's

17   perception that justice is being done, a concern that is vital

18   to the legitimacy of the criminal justice system."

19        That's exactly what we have here, Judge, because what

20   was the point of having a jury trial, because what the

21   government is really trying to do is come in here and say you

22   should give Mr. Bell 35 years because of all the sex

23   trafficking stuff that he either got acquitted of or we

24   dismissed.  The idea of using the state sex trafficking thing,

25   something that was not on that jury verdict form nor argued by

1    us is just another version of that.  It's completely unfair.

2    That's exactly what Justice Sotomayor is saying.  That's why

3    the Supreme Court looked to the Sentencing Guideline

4    Commission, said make that change because it's time for that to

5    change.  Now I'm not saying your Honor can't look at the

6    overall case, I think you can, but there's a big difference

7    between that and saying I'm going to sentence you, Mr. Bell,

8    for all this time based on something that you went to trial for

9    because you believed you were not guilty of it and guess what,

10   the jury also felt that way.  Now I know there was a hung, most

11   of those counts were hung, but there was an acquittal on the

12   main witness who started this whole thing and like I said

13   before, the government chose to dismiss it.

14         So if they wanted to come in here and argue it should

15   be sex trafficking, then let's do a trial.  Let's go.  We've

16   been ready since day one.  We came in here and for two months

17   we showed this jury why Mr. Bell was not a sex trafficker and

18   he is not.  So your Honor, I would say at this sentencing today

19   that you should just look at the drug convictions and the drug

20   case and that's it because everything else is just designed to

21   punish him for something that the jury said no to.  Thank you.

22         THE COURT:  So is the rule you would want me to

23   follow or the principle you'd want me to follow is if the

24   government tries to prove a defendant has violated the law and

25   that doesn't result in a conviction, then none of the evidence

```
1    going to that charge can be used by a sentencing judge?
2              MR. AMBERG:  Sure.
3              THE COURT:  That's what you would say is the
4    principle I should follow?
5              MR. AMBERG:  I believe that's the way it should be.
6              THE COURT:  Even if that relates to the charge on
7    which he was convicted?
8              MR. AMBERG:  Well then that's a bit of a different
9    story because yes and I think that and you're right, your
10   Honor, there should be a distinction there because you do have
11   a drug case and I have been in many sentencings where the
12   government will come in and say, you know, drugs are terrible
13   in society, things like that, like I think you can say that,
14   that's fine, but there's a big difference between that and
15   saying -- what's happening here is completely different.
16   What's happening here is all the stuff for the case we couldn't
17   prove, you should be looking at Judge because this is what's
18   really happening, sex trafficking was happening and all this
19   terrible stuff was happening.  No, they didn't prove that.
20             It's a drug case.  Yes, I get it, society has, like
21   drugs have societal consequences that orbit around the sale of
22   drugs.  That's in every single case.  That's in every single
23   drug case.  I'm sorry, anytime we have a drug case, that's a
24   part it and so yes I think you can consider that, your Honor,
25   but the specifics here where we have a jury acquitting and the
```

1    government dismissing the remaining charges is a big difference

2    than the general notion that yes, the sale of drugs can have

3    negative societal consequences.

4        MR. ROTH:  Your Honor, what if a drug conspiracy was

5    selling drugs to minors and they were just convicted of dealing

6    drugs, does the Court get to take into consideration that they

7    were minors?  What if they go to a homeless shelter and recruit

8    people from a homeless shelter to sell drugs.  Well, they're

9    just convicted of selling drugs so we can't take into account

10   they went to a homeless shelter and got homeless people to deal

11   drugs for them or illegal immigrants or any permutation of

12   those facts.

13       The reality is I am not going to stand before this

14   Court and say he's a sex trafficker, a convicted sex

15   trafficker, he's got to go, but I do get to go before this

16   Court and say when he created his conspiracy to distribute

17   drugs, when he chose the people that he chose to be his

18   co-conspirators, when he chose his location, he did that

19   because there was a vulnerable group of individuals ready to

20   buy his drugs and not just vulnerable people, but people that

21   can't even breathe without the drugs, that would buy drugs from

22   him four, five, six, seven times a day.  That was his choice to

23   pick that location and this clientele and to say that you can't

24   take that into consideration is just wrong.  It's just not what

25   the law says and whatever Sotomayor wrote in her opinion, they

1    still declined to grant cert and if you look at the opinion

2    there's a string cite of all the circuits that say that you can

3    consider acquitted conduct and I'm not asking you to consider

4    acquitted conduct, I'm going to ask you to look at the context

5    of the drug conspiracy and what was going on with it and who

6    they targeted and where they put it and all of that stuff

7    because he wasn't just slinging out of his house or just on a

8    block.  Everything was deliberate; who he enrolled, who he

9    enticed, where he put it, all of that.  It's all related to the

10   drug conspiracy and it's just incomprehensible to me for him to

11   say that you can't consider the surrounding circumstances and

12   the methodology to which he employed his conspiracy.  It

13   doesn't make sense.  It defies common sense.

14          THE COURT:  Mr. Amberg, let me ask you this.  Let's

15   assume a defendant is charged only with a drug conspiracy, but

16   there's evidence that one of the ways that the drug conspiracy

17   was facilitated was beating up drug purchasers who don't pay

18   their drug debts, but that's not charged.  Could I take into

19   into account in sentencing the defendant who's convicted of the

20   drug conspiracy?

21          MR. AMBERG:  I would say yes, but the guidelines

22   already do take that into account.

23          THE COURT:  I'm not talking about guidelines, I'm

24   talking about in terms of setting a just sentence.

25          MR. AMBERG:  Oh, I think you could, certainly, but

1    the difference between that and like Mr. Roth's example well

2    what if there was, you know, minors were involved and things

3    like that.  Well, if that was a charged offense and the jury

4    acquits that person of that, then yeah, there is a problem with

5    coming in there and saying that.  I mean --

6              THE COURT:  Well, let me ask you about that.  So an

7    acquittal or even a dismissal of charges is a non-adjudication

8    of whatever was charged; is that right?

9              MR. AMBERG:  I would, I would argue that the

10   government's charging and then dismissing after a hung jury,

11   it's the same effect as an acquittal.

12             THE COURT:  I misspoke.  I meant a hung jury or a

13   dismissal after a hung jury.  That's a non-adjudication of the

14   substance of the charge, right?

15             MR. AMBERG:  True, it's a non-adjudication because it

16   does give the government the ability to re, to do another

17   trial, but then what was happening is it's being, these charges

18   are not dismissed and instead of putting this before a jury and

19   getting the acquittals on the rest of the charges which is I

20   think exactly what would happen the next time we try this,

21   instead the government is saying hey we're going to dismiss

22   everything and now we're going to hold it against you at the

23   sentencing which they are.  Read the first sentence of their

24   memorandum.  I'm going to read it, your Honor.  The evidence at

25   trial established one unassailable conclusion, Darrick Bell was

1    the leader of a drug and sex trafficking conspiracies at the

2    Victory Inn.  Make no mistake about, this isn't just general

3    societal stuff in the background.  This is their argument, I

4    mean literally first sentence of their argument.

5          THE COURT:  Well, I understand what their argument

6    is, but I'm trying to understand why should the government be

7    in a worse position for having prosecuted a defendant and not

8    come up with a conviction or an acquittal, then it would be had

9    it never charged, the case I gave you where the drug purchasers

10   are beat up, but there's no charge in the case of assault.  You

11   agreed there that I could take into account the assaultive

12   behavior in sentencing someone convicted of the drug

13   conspiracy.  So why is the government going to be in a worse

14   position if it had charged assaults and the jury didn't reach a

15   verdict on that?

16         MR. AMBERG:  Well, because we put it in the province

17   of the jury.

18         THE COURT:  But aren't you even in a better position

19   there?  The charge has been made, you've had every incentive to

20   put in whatever evidence you might have wanted to put in or to

21   challenge the government's evidence whereas if you hadn't been

22   charged or your client hadn't been charged, there really

23   wouldn't be perhaps quite the same incentive, but here Mr. Bell

24   had every incentive to put forth whatever evidence there was

25   regarding sex trafficking and to challenge whatever evidence

```
 1    was put in regarding sex trafficking.  So there's no hiding of
 2    the ball, is there?  The defense had every opportunity to make
 3    as good a case as possible.  Why wouldn't the sentencing judge
 4    then have the benefit of all of that evidence because there,
 5    the defense had every incentive to resist it?
 6              MR. AMBERG:  Which we did.
 7              THE COURT:  Which you did.
 8              MR. AMBERG:  Very vigorously from what I recall --
 9              THE COURT:  Right.
10              MR. AMBERG:  -- and of course it worked out because
11    the jury I think was clear that they all agreed at least for
12    one part of this that the government hadn't met their burden,
13    but I understand what you're saying, your Honor.  I think that
14    when we have -- this is a very unique case.  This isn't like
15    bad things happened in the course of the conspiracy.  This is
16    like two separate cases in one here.  You have the drug case
17    and then you have the sex trafficking case.
18              THE COURT:  But they're not totally separate cases
19    because the government's theory is that the sex trafficking was
20    used to facilitate the drug conspiracy, right?  It's not like
21    he was charged with stealing mail and drug conspiracy.  Those
22    are totally separate crimes, right?
23              MR. AMBERG:  Well, I --
24              THE COURT:  Here, the government's theory is that
25    both crimes worked hand in glove, right?  That's the theory
```

1    just like beating up the drug purchaser who doesn't pay his

2    drug debts would be conduct that's related.  So these two

3    episodes are not really distinct episodes although they're

4    legally distinct in some ways, but there's an overall,

5    overarching connection between the two kinds of charges, right?

6         MR. AMBERG:  But if you look at it from the other

7    point of view, let's say it's a drug conspiracy and there's a

8    murder that's charged as part of the drug conspiracy and then

9    the person gets acquitted of the murder, right?  I think

10   McClinton, that that's sort of the issues there.  Then at the

11   sentencing whether that was the prosecutor or the government,

12   I'm not sure which it was, but the prosecutor gets up and goes

13   oh, this is a murder here, Judge, you should give him the,

14   sentence him like he killed this guy even though the jury

15   acquitted him of it.  I mean, there's a fine line between the

16   general sidle things that can happen in the course of a drug

17   conspiracy versus using very specific conduct and allegations

18   that have been either acquitted or dismissed at the behest of

19   the government after a trial, so I think that it's more, this

20   is more of the guy gets acquitted of murder, but we're going to

21   use the murder against him at sentencing kind of situation.

22        THE COURT:  All right.

23        MR. ROTH:  Your Honor, real just a correction to what

24   Mr. Amberg said.  The Court found by a preponderance of the

25   evidence that McClinton was responsible for the death and it

 1   changed the offense variable from 23 to 43.  So this is in the
 2   context of using acquitted conduct when engaging in a
 3   guidelines analysis and ultimately an offense level 20 points,
 4   20 levels higher.  We're not talking about that in this case.
 5   We're talking about allocution, so I wanted to make it clear
 6   that the context of <u>McClinton</u> is you're using an acquitted
 7   charge to raise the offense variable 20 levels.  We're saying
 8   we're using the conduct as the Court noted that's connected to
 9   the drug conspiracy to argue for a sentence that we're asking
10   for, but I just wanted to make that distinction.
11           THE COURT:  All right, look.  I think we're going to
12   need some more briefing on the first two issues that we're
13   talking about regarding the prior convictions and the 15-year
14   matter and the drug quantities and I'm hearing some objection
15   from the defense that the government has waived this issue and
16   I don't want to try to resolve that without giving everybody a
17   chance to put in writing exactly what they want me do and what
18   I should rely on and at the same time I think with our last
19   discussion here regarding conduct for which the jury did not
20   reach a verdict and the charges were then later dismissed.  I'd
21   like you if you want to give me anything further on that
22   subject, the government's treatment of that was fairly brief
23   and I'm not saying that was inappropriate, but if you want to
24   take an opportunity to elaborate on that, both sides can feel
25   free to use this opportunity to do that.  So we're going to

1    have to adjourn the sentencing.  Let me get a time frame for

2    you, hold on.

3              (Pause)

4              THE COURT:  All right.  Let me ask the attorneys how

5    much time would you need to file supplemental sentencing

6    memoranda?

7              MR. AMBERG:  Your Honor, umm, I'm in the middle of a

8    lengthy complex trial right now.  I know Mr. Hatlem and I

9    project probably about three more weeks maybe before and then I

10   know it's only going to get crazier because the last couple of

11   weeks are really where my client is the center stage so I'm not

12   going to have any time until probably after that trial's over,

13   maybe a month and-a-half?

14             THE COURT:  You're talking about getting something

15   filed by middle of May?  Is that what you're talking about?

16             MR. AMBERG:  Yes, your Honor.

17             THE COURT:  All right.  How does the government feel

18   about that?

19             MR. ROTH:  Without giving your clerk a coronary heart

20   attack, Judge, umm, there's other sentencings that are waiting

21   for this one to proceed.

22             THE COURT:  I know.

23             MR. ROTH:  I would represent to the Court that there

24   are two sentencings scheduled next Thursday that I just don't

25   think will be impacted by this sentencing, but the remainder of

1   them may.  Mr. -- I know Mr. Amberg and Mr. Hatlem are involved

2   in that case and I would leave the timing of it to the

3   discretion of the Court.

4        MR. AMBERG:  And your Honor, also could I make an

5   oral motion for an appointment of a second CJA panel lawyer to

6   help me out with that brief and then potentially even the --

7        THE COURT:  Hold on.

8        MR. AMBERG:  I apologize.

9        (Pause)

10       THE COURT:  All right, so May 15 for your sentencing

11  memos and we can conduct the sentencing on June 10 at 9:00.

12  Would that work for everybody?

13       MR. ROTH:  Judge, if I can just look at my calendar

14  real quick, make sure I don't have a conflict?

15       (Pause)

16       MR. ROTH:  June 10 works for the government.

17       THE COURT:  Mr. Amberg, okay?

18       MR. AMBERG:  Yes, your Honor.  It works for me as

19  well.

20       THE COURT:  All right.  Now as far as getting more

21  help, you have to file a written motion because we have to get

22  approval from the Circuit for that, so we need something in

23  writing.

24       MR. AMBERG:  Okay.  I recently did it with Judge

25  Friedman where I just orally asked for a second lawyer and he

1    granted it, but I agree.  What I'll do your Honor is just so

2    you know what I'm going to do, I'll file a motion requesting --

3    I already spoke with another CJA panel lawyer that I thought

4    would be perfect to help write this brief, somebody who's --

5    Mr. Machasic, you've probably met him, he's very experienced in

6    complex cases.  I'll call Mr. Carter as well and see and I'll

7    get something to you as soon as I can this week.

8              THE COURT:  Okay.

9              MR. ROTH:  Judge, if he's going to have somebody else

10   write it for him, can we move up, we'd move the dates or are we

11   going to keep the dates the same?

12             MR. AMBERG:  Even with that, your Honor, it's going

13   take time.  I mean and I'm thinking more ahead, too, for

14   purposes of, once the case is in the Court of Appeals.

15             THE COURT:  Well, we don't know what the Court of

16   Appeals is going to do with a request like this so I'm going to

17   keep it just as is.  We'll have the sentencing memos due May 15

18   and we'll have the sentencing June 10, 9:00 a.m.  Put

19   everything in there that you think I need to know and as far as

20   MDOC goes, this would be an opportunity to see whatever

21   additional information, if any, is available from MDOC

22   regarding the prior convictions and when those sentences were

23   completed.  Anything else?  For the government?

24             MR. ROTH:  Nothing else from the government, your

25   Honor.

1          THE COURT:  Mr. Amberg, anything?

2          MR. AMBERG:  No, your Honor.

3          THE COURT:  All right.  My thanks to Mr. Yarbrough,

4    Ms. Sandusky, Ms. Lorenc for their assistance this afternoon.

5    Thank you.

6          (Hearing adjourned at 4:41 p.m.)

7                    --    ---    --

1          C E R T I F I C A T E

2

3

4

5

6

7          I, David B. Yarbrough, Official Court

8    Reporter, do hereby certify that the foregoing pages

9    comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Monday, April

11   1st, 2024.

12

13

14

15

16   5/13/2024                /s/ David B. Yarbrough

17   Date                     David B. Yarbrough,
                              (CSR, RPR, FCRR, RMR)
18                            231 W. Lafayette Blvd.
                              Detroit, MI  48226
19

20

21

22

23

24

25